# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
Newport News Division


TARA VERNELL HALL,

                              Plaintiff,

v.                                                       ACTION NO. 4:14cv161


CAROLYN W. COLVIN,
Acting Commissioner of Social Security,

                              Defendant.


## UNITED STATES MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

Plaintiff, Tara Hall ("plaintiff" or "Hall"), brought this action pursuant to 42 U.S.C. § 405(g), seeking judicial review of a decision of the Acting Commissioner ("Commissioner") of the Social Security Administration ("SSA") denying Hall's claim for a period of disability and disability insurance benefits ("DIB") under Title II of the Social Security Act, as well as her claim for Supplemental Security Income ("SSI") under Title XVI of the Social Security Act.

An order of reference dated February 20, 2015, assigned this matter to the undersigned. ECF No. 10. Pursuant to the provisions of 28 U.S.C. § 636(b)(1)(B) and (C), Rule 72(b) of the Federal Rules of Civil Procedure, and Local Civil Rule 72, it is hereby recommended that Hall's motion for summary judgment (ECF No. 16) be DENIED, and that the Commissioner's motion for summary judgment (ECF No. 18) be GRANTED.

# I. <u>PROCEDURAL BACKGROUND</u>

Plaintiff, Tara Hall, protectively filed applications for DIB and SSI on September 23, 2011, R. 23, 219-33, 292[1], alleging she became disabled on September 2, 2010 due to anxiety, depression, menopause, high blood pressure, high cholesterol, benign trembling, and short term memory loss.  R. 85, 99.  Hall later amended the alleged onset date of disability to October 18, 2011.  R. 50-51.  The Commissioner denied Hall's applications on January 4, 2012 and, upon reconsideration, on August 10, 2012. R. 159-71, 173-86.  At Hall's request, an Administrative Law Judge ("ALJ") heard the matter on August 16, 2013, and at that hearing received testimony from Hall (who was represented by counsel), her pastoral counselor, and an impartial vocational expert ("VE").  R. 45-83.  On September 16, 2013, the ALJ denied plaintiff's claims, finding that Hall was not disabled.  R. 23-33.

On October 7, 2014, the Appeals Council denied Hall's request for review of the ALJ's decision. R. 1-5, 14-18.  Therefore, the ALJ's decision stands as the final decision of the Commissioner for purposes of judicial review.  *See* 42 U.S.C. §§ 405(g), 1383(c)(3); 20 C.F.R. §§ 404.981, 416.1481.  Having exhausted all administrative remedies, Hall filed a complaint with this Court on December 8, 2014.  ECF No. 3.  The Commissioner answered on February 3, 2015.  ECF No. 8.  In response to the Court's order, the parties filed motions for summary judgment, with supporting memoranda, on April 27 and May 27, 2015, respectively.  ECF Nos. 16-17, 18-19.  As neither party has indicated special circumstances requiring oral argument, the case is deemed submitted for a decision.

---

[1] Page citations are to the administrative record previously filed by the Commissioner.

## II. <u>RELEVANT FACTUAL BACKGROUND</u>

### A.    *Hall's Background*

Tara Hall was born in 1969 and was 42 years old on October 18, 2011, the amended onset date of her alleged disability.  R. 50-51, 219.  Hall has completed approximately two years of college and previously worked as a clerk and as a customer service representative at call centers.  R. 266.  At the August 16, 2013 hearing before the ALJ, Hall reported suffering from anxiety and depression for a "very long time," but indicated that her condition worsened in October 2011 when she experienced a "nervous breakdown" and her husband temporarily left her.  R. 47.  Hall contends that the severity of her condition after these events precludes her from performing any work.  R. 50-51, 53-54.

### B.  *Relevant Medical Record from October 17, 2011*

On October 17, 2011, Hall received treatment at the Sentara Careplex Hospital after reporting that she took ten over-the-counter pills as a sleep aid and was anxious and having tremors.  R. 742.  After treating Hall and prescribing her three medications, the emergency department discharged her that same day.  Tr. 748.

The next day, and apparently after her husband left her that morning saying he wanted a divorce, Hall reported to Riverside Regional and complained of feeling anxious and depressed. R. 669.  Hall reported taking numerous sleeping pills every night to fall asleep, rather than to harm herself, and stated she had been doing so for years.  R. 669.  After medically clearing and diagnosing Hall with depression and elevated blood pressure, Riverside Regional transferred her that same day to a voluntary crisis stabilization unit with the Hampton/Newport News Community Services Board ("HNNCSB").  R. 664, 671-72.

From October 18, 2011, until her discharge on October 24, 2011, Hall received inpatient treatment from the HNNCSB.  A preadmission screening report indicated, among other things, that:  (1) Hall was "unemployed but seeking;" (2) Hall reported that seizure-like shaking initially caused her to go to Sentara for treatment; and (3) Hall reported multiple stressors including a child protective services case relating to her son, marital problems, untreated mental health issues for several years, and the regular ingestion of many sleeping pills, but denied any thoughts of suicide.  R. 583  An accompanying mental status exam found Hall to be depressed, anxious, initially guarded, with an unkempt appearance, uncontrolled shaking, a constricted affect, an impaired thought process but normal thought content, impaired memory and judgment, sleeping issues, and an irregular appetite.  R. 585.  During a later examination, Hall reported a prior psychiatric hospitalization in 1998 at Danville Regional Medical.[2]  R. 596.

After her admission, Hall was prescribed Wellbutrin and Vistaril, treated with Clonidine (for elevated blood pressure), and received individual and group counseling over the course of five days.  R. 592.  During this counseling, Hall discussed the stressors noted above, her insomnia, her family history and problems, and the prospect of an impending divorce.  R. 604-05.  Although the external issues confronting Hall had not been resolved, during her stay at the crisis unit, Hall's condition was stabilized, her affect improved, and she reported on several occasions that she had slept well at night while in the unit.  R. 609 (patient reports "doing better" and "doing well"); 624-26 (Hall slept and interacted well, displayed good grooming and a "euthymic affect," and showed a healthy appetite); 632 (Hall was "feeling better," "sleeping well," and discussed whether to go home); 633 (noting "slept well" and "bright affect"); R. 639-40 (client "slept well" and "[a]ffect is bright").   On October 24, 2011, the crisis center

---

[2] On November 7, 2011, Hall reported that this psychiatric hospitalization for depression and anxiety occurred in 1995 or 1996.  R. 719.

discharged her from inpatient care, directed her to the HNNCSB for further outpatient treatment, and prescribed her Wellbutrin, Vistaril, and Trazadone.  R. 578, 610.

From November 2011 through May 2013, Hall received counseling and treatment from the HNNCSB.  A psychiatric evaluation of Hall conducted on November 7, 2011 when Hall came in for "medication management," reported that Hall and her husband had recently separated and she was concerned about obtaining shared custody of her son, that she had not filled her prescriptions from the crisis unit due to financial reasons, and that she last worked for a couple of weeks at a call center in September.  R. 719-21.  A mental status exam reported Hall had a dysphoric mood and congruent affect, was pleasant, calm, and cooperative, fully oriented, with linear, coherent, and goal-directed thought processes, and without psychotic thought content.  R. 720.  A physician's assistant ("PA"), Russell Lantz, diagnosed Hall as having a major depressive disorder, recurrent, moderate, and identified a treatment plan that included individual therapy and attempted to get Hall assistance in getting her prescriptions filled.  R. 720-21, 724 (noting a nurse met with Hall and provided her "with meds . . . includ[ing] Wellbutrin").

On November 10 and 17, 2011, Hall reported to the HNNCSB and received individual therapy.  R. 715-16 (client was calm and cooperative, expressed herself clearly, and reported "sleeping better"), 717-18 (client was occasionally flustered, angry, and nervous when discussing situation with spouse and had a "flat affect," but was very cooperative).

During a December 7, 2011 session with PA Lantz, Hall reported that she and her husband had reunited and this resolved certain custody and legal issues concerning their 13-year old son.  R. 713.  Hall further advised that she was taking an online class, of five weeks' duration, to try to obtain a four-year degree in health administration.  R. 713.  Hall reported

taking her Wellbutrin, but not Trazodone, and told the examiner she was getting her Trazodone and Vistaril prescriptions filled that day, apparently to deal with ongoing insomnia.  R. 713-14. Hall further noted her primary care physician had referred her for an appointment with a neurologist to rule out any possible seizure disorder, apparently associated with Hall's tremors. R. 713.  While noting Hall's mildly dysphoric mood and constricted affect, PA Lantz also found Hall to be calm and cooperative, fully oriented, nicely dressed and groomed, with spontaneous speech, and normal thought processes.  R. 713.  PA Lantz's treatment plan increased Hall's dosage of Wellbutrin, directed the taking of the other two medications, and encouraged Hall to continue with individual therapy.  R. 714.

On January 13, 2012, Hall again saw PA Lantz for a medication review.  During this meeting, Hall attributed her failure to return for individual therapy to her decision to soon begin counseling with her pastor.  R. 711.  Hall reported having trouble falling asleep, but also indicated she was now sleeping five to six hours per night.  R. 711.  PA Lantz observed Hall to have a slightly dysphoric mood and constricted affect, but noted she continued to be calm and cooperative, fully oriented, nicely dressed and groomed, with spontaneous speech, and normal thought processes.  R. 711.  He increased Hall's bedtime dosage of Trazodone to help her with sleeping.  R. 711.

On April 4, 2012, Hall received a neurological consultation from Dr. Maria Guina of Sentara Neurology Specialists.  During this examination, Hall reported having hand tremors "all her life [which were] gradually worsening," but said they did not impede her daily living activities.  R. 726.  Hall further reported having panic attacks dating back to high school, which were presently occurring two to three times a month.  R. 726.  Although Hall reported being "highly anxious" and having muscle spasms, memory loss, and poor memory when having

attacks of anxiety, she also reported being in school for health care administration for about a year and "getting As and Bs" in her classes, handling her own banking, and driving without difficulty.  R. 726.  Following testing and examination, Dr. Guina's diagnostic impressions were that Hall suffered from anxiety and a tremor and she reporting finding "[n]o evidence for seizures" and did not recommend a work up.  R. 725.  Instead, Dr. Guina prescribed Clonazepam for Hall's anxiety.  R. 725.

Also on April 4, 2012, Hall reported to the HNNCSB, where she picked up one medication and had her prescriptions for Vistaril and Trazadone called into Wal-Mart for pickup by her.  R. 802.

On April 25, 2012, Hall reported to the Sentara Careplex emergency department complaining of vomiting, nausea, and dizziness.  R. 772, 774.  After an examination which noted Hall's non-compliance with blood pressure medications, Hall was treated for nausea, given information concerning hypertension, and discharged the same day.  R. 773-74, 785-88.  The examination notes indicate that Hall was fully oriented, in no distress, and that her mood, memory, affect, and judgment were normal.  R. 776-77.

On May 2, 2012, PA Lantz again met with Hall and noted, in response to Hall's reporting that she ran out of medications for about a month prior to reporting to the HNNCSB on April 4th, that Hall "had run out of medications because she did not come back" for her six week recommended follow-up appointment.  R. 792.  Hall reported having sleeping problems when she was not taking Trazodone, and advised that she was continuing with her online schooling.  R. 792.  PA Lantz reported on this visit that, while Hall's presented with an anxious mood, a constricted affect, and she engaged in "a lot of wringing of her hands," he also found her to be pleasant and cooperative, well groomed, maintaining good eye contact, having spontaneous

speech, and with normal, linear thought processes.  R. 792.  His diagnostic impressions on this date were major depressive disorder, recurrent and moderate, and probable anxiety disorder.  R. 792.

PA Lantz reported these same diagnoses after seeing Hall again on June 19, 2012.  His mental status examination of Hall on that date remained mostly the same, except that he noted that Hall's affect was only mildly constricted.  R. 791.  On this date, Hall reported she continued to see her pastor for counseling, but was considering going elsewhere.  R. 791.

After picking up medication from a nurse at the HNNCSB on July 5 and August 1, 2012, R. 796-97, Hall reported to the HNNCSB on August 30, 2012 and was seen by Dr. Lisa Mensch, a psychiatrist.  R. 832.  On this date, Hall reported she was "doing fine and that her medicines [were] working well" and she was "sleeping well."  R. 832.  Dr. Mensch's mental status examination reported Hall appeared anxious, but was otherwise pleasant and cooperative, had normal speech, appropriate eye contact, a euthymic mood, a full and appropriate affect, normal thoughts and processes, and fair insight and judgment.  R. 832.

One month later, on September 25, 2012, Dr. Mensch made similar findings following an appointment in which Hall reported that "everything is going well and that she is doing fine" and sleeping well.  R. 830.

On December 11, 2012, Hall again met with Dr. Mensch and reported having run out of certain medications and having multiple stressors, including a father with cancer and a troubled son, which were interfering with her sleep.  R. 827.  Hall reported feeling "quite stressed" and "angry lately" and said she was amenable to resuming therapy to aid with the stress.  Notwithstanding these difficulties, Dr. Mensch's mental status examination found Hall to be fully alert and oriented, pleasant and cooperative, with a fluent and appropriate affect, with

normal speech, with normal thought processes and content, and a stressed and angry mood.  R. 827.  Dr. Mensch continued the previously noted diagnoses for major depressive disorder and anxiety, changed some of the dosages on Hall's medications and referred her for therapy.  R. 827.

On January 28, 2013, Hall received individual therapy at the HNNCSB.  She presented with a euthymic and full affect, with linear and goal-directed thought that was not always logical in progression, and exhibited good hygiene and grooming.  R. 876.  After initially telling this new therapist about her habit of talking out loud to herself, Hall revealed that she did this so that "her husband will listen to her" and expressed increasing anger because he ignores her.  R. 876.  During this session, Hall expressed anger at having been denied disability benefits and indicated she viewed disability as a means to "obtain her own income so that she does not have to depend on her husband who said he intended to leave her when their son turned 18 years old."  R. 876.  The therapist further noted that Hall "consider[ed] applying for a job although she tells herself that she [is] not capable of working because she had 'a nervous breakdown' a few years ago."  R. 876.  The therapist noted Hall "supports this with her concern that she could have a panic attack that would leave her mentally paralyzed," but admitted the last such attack occurred almost one year ago.  R. 876.  Hall advised she continued taking online classes towards a degree in healthcare management.  R. 876.

On February 21, 2013, Hall met with the same therapist and advised her father recently passed away.  R. 874.  Due to the emotional upset associated with her father's last days, Hall reported she missed several doses of medication.  R. 874.  During this session, the therapist noted Hall appeared inappropriately dressed, was tense and irritable with speech that was sometimes pressured, exhibited a constricted affect, and her thoughts were linear and goal-directed, but

sometimes illogical in progression.  R. 874.  Hall also spoke about her son's difficulties and her hope for disability benefits and noted that "she is now falsely telling benefits people that her husband does not live with her and pays her bills only until she can support herself, which she believes will qualify her [for benefits.]"  R. 874.  The therapist referred Hall to the nurse.  R. 875.

On May 9, 2013, Hall again saw Dr. Mensch and advised she was doing "fairly well," her mood was "okay," and she was looking for part-time work.  R. 872.  Hall requested and received a change in her Trazodone dosage to aid her in falling asleep.  R. 872.  Dr. Mensch observed Hall to be well-dressed and groomed, fully oriented with normal speech, having a full affect and euthymic mood, and with normal thought content and processes.  R. 872.  Although retaining her prior diagnostic impressions, Dr. Mensch noted that Hall's depression appeared to be "in remission."  R. 872.

### C.    Medical Opinions and Residual Functional Capacity Assessments

Just over one year before her amended onset disability date of October 18, 2011, Hall saw Dr. Ronald Kidd, a clinical psychologist for an initial psychological assessment and approximately four counseling visits from August 2010 through January 6, 2011.  R. 450-67, 548-54.  At that time, Dr. Kidd diagnosed Hall with anxiety disorder.  R. 451, 550.  Following the counseling visits, on February 28, 2011, Dr. Kidd wrote Hall's worker's compensation and leave administrator.  In this letter, Dr. Kidd stated that, although following her initial assessment he assessed Hall as "unable to carry out the duties assigned to her pending resolution of the condition adversely affecting her ability to perform," she was now "able to return to work in her former capacity" and that, with appropriate training, "would be able to perform other duties within her general premorbid capabilities."  R. 553.

On December 5, 2011, Dr. Kidd completed a residual functional capacity ("RFC") questionnaire and mental capacity assessment for Hall in conjunction with her disability claim, but did not examine her on that date.  R. 131, 691-94.  Instead, he reported last treating Hall in January 2011 and now opined Hall's anxiety disorder caused various marked and extreme limitations in the areas of sustained concentration and persistence, social interaction, and adaptation.  R. 691-94.  To explain his assessment, Dr. Kidd noted only that "episodes of anxiety without apparent precipitating events interfere in functioning and lead to 'escape' behavior, avoidance, and withdrawal."  R. 694.

On December 21, 2011, Hall received a consultative examination from Charles Koah, a licensed professional counselor, following a referral made by the state agency examining Hall's claim of disability.  On December 23, 2011, Mr. Koah reported his general observations of Hall, noted Hall's complaints of depression, anxiety, and insomnia, obtained a history from her regarding her illness, evaluations, and treatment, assessed her mental status, reported his diagnostic impressions (major depression, chronic, and generalized anxiety disorder), and assessed her RFC.  R. 695-701.  With respect to the latter, Mr. Koah opined that Hall could perform simple and repetitive tasks without special supervision and appeared capable of interacting with the public and co-workers.  R. 700.  He further opined she may have difficulty performing complex and detailed tasks and her depression and anxiety may impact her ability to perform work on a consistent basis.  R. 700.

On January 3, 2012, a non-examining state agency psychological consultant, Sreeja Kakakkal, M.D., conducted a mental RFC assessment and opined that Hall had no more than moderate limitations in understanding and memory, concentration and persistence, social

interaction, and adaptation.  R. 94-96.

On August 9, 2012, a second, state agency, non-examining, psychological consultant, Stonsa Insinna, Ph.D., LCP, assessed Hall's mental RFC.  Dr. Insinna also opined that Hall had no more than moderate limitations in understanding and memory, concentration and persistence, social interaction, and adaptation.  R. 129-30.

After the ALJ issued his September 16, 2013 decision, Hall requested that Dr. Kidd conduct a clinical interview and mental status examination in conjunction with her claim for disability and he did so on September 30, 2013.  R. 883.  On October 7, 2013, Dr. Kidd reported he reassessed areas of functioning previously noted to be deficient "to determine whether further reduction in function had occurred."  R. 883.  He advised that Hall "appeared to become less and less socially effective—not being able to work, not being able to sustain close relationships and not engaging effectively in self-care."[3]  R. 883.  Although noting that Hall was advised to seek and had obtained a neurological assessment, Dr. Kidd did not discuss the results of such testing, as described above.  R. 883.  Similarly, he neither discussed nor indicated awareness of Hall's extensive treatment and counseling at the HNNCSB, and instead noted that Hall "said that she will *start psychotherapy* at CSB on October 1, 201 [sic] and . . . will start additional medications to treat what she called a 'bipolar disorder.'"  R. 883-84   With respect to Hall's mental status, Dr. Kidd observed she was fully oriented, her working memory and ability to concentrate were impaired, her immediate recall was intact, and found she possessed adequate social judgment and was capable of abstract verbal reasoning.  R. 884.  Dr. Kidd also assessed Hall's verbal and nonverbal intellectual functioning.  His testing showed Hall scored in the low average range of verbal intellectual functioning and performed at the age of a seven year old child with respect to

---

[3] It is unclear whether these statements by Dr. Kidd refer to Hall's condition in late 2010 and early 2011 or to her condition on September 30, 2013.  In spite of the report's ambiguity, the Court construes them to relate to the later date.

nonverbal intellectual functioning.    R. 884.    Functionally, Dr. Kidd advised that Hall's limitations in nonverbal functioning translated into "difficulty recognizing and comprehending the meanings of nonverbal social cues . . . ."   R. 884.   Dr. Kidd concluded that, while Hall's verbal skills would suggest she was socially effective, "her ability to implement in social settings her verbal understandings is likely to be similar to that of children of the age of seven." R. 884.

### D.    Testimony before the ALJ

*(Tara Hall)*

At the hearing on August 16, 2013, Hall testified she last worked in early September 2011, while undergoing training to work in customer service as a package tracker.  R. 45-46. According to Hall, her employer fired her due to poor test scores and that fact that she had "issues" being nice to others and maintaining her patience.  R. 55.  Hall reported suffering from anxiety and depression for a "very long time," but that her condition worsened in October 2011 when she experienced a "nervous breakdown" and her husband temporarily left her.  R. 47.  At the hearing, Hall (and her attorney) indicated that the severity of her condition as of October 18, 2011, precluded her from returning to work.  R. 50-51, 53-54.

After that date, Hall testified that she found it hard to get up in the mornings and that she could not care for her son in the way that she desired.  R. 48-49.  Although unable to specify their frequency, Hall stated she suffered random panic attacks, when stressed out by family and personal difficulties.  R. 51-53.  During such attacks, Hall reported having tremors, feeling numb, and having chest pains and difficulty breathing.  R. 51-52.  Hall stated, however, that taking an aspirin usually resolved any severe chest pain.  R. 52.  Hall also reported being confused and having difficulties concentrating at times, which caused her to occasionally call someone by the wrong name, to be unable to find her keys, and to "completely forget something

instantaneously." R. 53.

With respect to her daily activities, Hall testified that, although she regularly did not feel like leaving her home or sometimes maintaining her personal hygiene, R. 50, 56, 60-61, she shops for groceries with her husband, does most of the chores around the house (other than when she could not find the energy to do so), sometimes watches television, and drives herself only when her husband and daughter were unavailable to do so. R. 48. Hall identified her primary hobby as going to church, which she identified as a source of hope, health, and strength and where she saw her pastor (Dr. Stephanie Moore) for counseling. R. 48-49, 57, 61. Although she reported usually attending church once or twice a week, Hall indicated that she recently missed three weeks because it was "too hard . . . to get up and even go to church." R. 61. She also advised that she did not socialize there and sometimes left early, when she felt an oncoming panic attack. R. 48, 56. Hall also testified that, although she did not have "visions or anything," she regularly talked out loud to herself when upset and did so, on occasion, so that others in the house would know how she felt. R. 59-60. She indicated her lack of patience has caused her to have trouble maintaining family relationships. R. 62.

Hall testified that she has more bad days than good ones and exhibited some uncertainty about her condition, stating that she was "definitely . . . getting worse," but also noting "[i]t's kind of iffy . . . because . . . it kind of improved, but it's worse on the other end." R. 57. Hall advised that she is always unhappy, suffers from mood swings, and does not care about herself. R. 57.

Nevertheless, Hall also testified about taking online classes at Ashford University for two years, concentrating on psychology and human resources, before stopping in April 2013 due to a billing issue. R. 73-76. Hall reported completing roughly ten courses (each of a five-week

duration) and having earned "about 70 credits" towards her degree. R. 74-75. Hall testified that she received mostly A's and B's, with a few C's, along with one F, for her coursework. R. 75. She reported taking online classes "pretty much all day." R. 75. In addition to doing her homework (including reading and online discussions), R. 77-78, Hall testified she interacted with classmates online, which allowed her to be sociable without having to undertake the "very hard" task of "confront[ing] them" in person. R. 75. To ensure she could keep up with this work, Hall signed up for a wellness access class, which enabled her to receive tutoring and additional time to take tests and complete assignments. R. 78. Upon resolution of the billing issue, Hall stated she intends to resume her online studies. R. 75.

*(Hall's Pastor – Dr. Stephanie Aaron)*

Hall's pastor, Dr. Stephanie Aaron, obtained a degree in pastoral counseling and Christian counseling and psychology from the St. Timothy School of Theology. R. 65. She testified that she has treated Hall, as her pastor and counselor, for three years. R. 66. She diagnosed Hall as being "very psychotic" and having a panic disorder, and testified Hall was prone to blackouts while in counseling, unable to stay on point in discussion, occasionally unable to differentiate what is real and what is not, and as appearing to change personalities during conversation. R. 66-68, 71-72.

*(Vocational Expert – Edith Edwards)*

Edith Edwards, a vocational expert, testified that a hypothetical person with Hall's age, education, and work experience, who was able to perform medium work activity, limited to simple, repetitive, nonproduction tasks, but without frequent interaction with co-workers or the public, could perform light and medium jobs, including work as janitor/industrial cleaner, kitchen helper, housekeeper, and office helper, which jobs exist in significant numbers in the

national economy.  R. 79-81.

### III.  THE ALJ's DECISION

To evaluate Hall's claim of disability[4], the ALJ followed the sequential five-step analysis set forth in the SSA's regulations for determining whether an individual is disabled.  *See* 20 C.F.R. §§ 404.1520(a) and 416.920(a).  Specifically, the ALJ considered whether Hall:  (1) was engaged in substantial gainful activity; (2) had a severe impairment; (3) had an impairment that meets or medically equals a condition within the SSA's listing of official impairments; (4) had an impairment that prevents her from performing any past relevant work; and (5) had an impairment that prevents engaging in any substantial gainful employment.  R. 25-32.

The ALJ found that Hall met the insured requirements[5] of the Social Security Act through June 30, 2016, and she had not engaged in substantial gainful activity since October 18, 2011, her amended, alleged onset date of disability.[6]  R. 25.  At steps two and three, the ALJ found Hall had two severe impairments, depression and anxiety, but that these impairments did not singly or in combination meet or medically equal the severity of one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, as required for a finding of disability at step three.  R. 25-27 (citing 20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925,

---

[4] To qualify for SSI and/or DIB, an individual must meet the insured status requirements of the Social Security Act, be under age sixty-five, file an application, and be under a "disability" as defined in the Act.  "Disability" is defined, for the purpose of obtaining disability benefits, as the inability to do any substantial gainful activity, by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months.  20 C.F.R. § 404.1505(a); *see also* 42 U.S.C. §§ 423(d)(1)(A), 416(i)(1)(A).  To meet this definition, the claimant must have a "severe impairment" making it impossible to do previous work or any other substantial gainful activity that exists in the national economy.

[5] To qualify for DIB, an individual must also establish disability that commenced on or before the last day in which that individual met the insured status requirements of the Social Security Act.  *See* 42 U.S.C. § 423(a), (c); 20 C.F.R. § 404.131(b).

[6] During the hearing, the ALJ granted Hall's request to amend the alleged onset date of disability from September 2, 2010 to October 18, 2011.  R. 50-51.

416.926).  The ALJ found that Hall's remaining impairments (menopause, high blood pressure, high cholesterol, benign trembling, and short term memory loss) were non-severe because they did not exist for a twelve month continuous period, required no significant medical treatment, or failed to result in any continuous functional limitations, whether exertional or non-exertional. R.26.  The ALJ next found that Hall possessed a residual functional capacity to perform medium work, as defined in 20 C.F.R. §§ 404.1567(c), 416.967(c), with the exception that she is limited to "simple, repetitive, non-production job tasks, without frequent interaction with co-workers or the general public."  R. 27-31.  At step four of the analysis, the ALJ determined that Hall was unable to perform any past relevant work, including work as a customer service representative and as a debt collector, and that her RFC encompassed only the performance of simple, unskilled work.  R. 31.  Finally, at step five, and after considering Hall's age, education, work experience, and RFC, the ALJ found that there are other jobs (such as janitor/industrial cleaner, kitchen helper, officer helper, and housekeeper), existing in significant numbers in the national economy, which Hall could perform.  *Id.* at 31.  Accordingly, the ALJ concluded that Hall was not under a disability from October 18, 2011 through the date of the ALJ's decision and was ineligible for a period of disability, DIB, or SSI benefits.  R. 32-33.

## IV.  STANDARD OF REVIEW

In reviewing a decision of the Commissioner denying benefits, the Court is limited to determining whether the Commissioner's decision was supported by substantial evidence on the record, and whether the proper legal standard was applied in evaluating the evidence.  42 U.S.C. § 405(g); *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (citing *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996)); *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to

support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. of N.Y. v. NLRB*, 305 U.S. 197, 229 (1938)).  It consists of "more than a mere scintilla" of evidence, but may be somewhat less than a preponderance of evidence. *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966).

When reviewing for substantial evidence, the Court does not undertake to re-weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the Commissioner.  *Craig*, 76 F.3d at 589; *Hays*, 907 F.2d at 1456.  "Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the [Commissioner] (or the [Commissioner's] designate, the ALJ)." *Craig*, 76 F.3d at 589 (quoting *Walker v. Bowen,* 834 F.2d 635, 640 (7th Cir. 1987)).  The Commissioner's findings as to any fact, if supported by substantial evidence, are conclusive and must be affirmed, unless the decision was reached by means of an improper standard or misapplication of the law. *Perales*, 402 U.S. at 390; *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987) (citing *Myers v. Califano*, 611 F.2d 980, 982 (4th Cir. 1980)).  Thus, reversing the denial of benefits is appropriate only if either (A) the record is devoid of substantial evidence supporting the ALJ's determination, or (B) the ALJ made an error of law.  *Coffman,* 829 F.2d at 517.

## V. ANALYSIS

### A.  The ALJ Properly Considered and Explained the Weight Given to Dr. Kidd's Opinions

Hall first challenges the ALJ's decision by arguing the RFC finding fails to account for Hall's limitations and is unsupported by substantial evidence, due to the ALJ's failure to adhere to the treating physician rule and his attribution of "little weight" to Dr. Kidd's opinions.  Hall argues the ALJ failed to identify persuasive, contrary evidence when discounting Dr. Kidd's

opinion and failed to correctly evaluate pertinent factors in assessing the weight to be given to such an opinion.

The regulations provide that, after step three of the ALJ's five-part analysis but prior to deciding whether a claimant can perform past relevant work at step four, the ALJ must determine a claimant's RFC.   20 C.F.R.  § 404.1545(a) and § 416.945(a).   The RFC is a claimant's maximum ability to work despite her limitations.   *Id.* at § 404.1545(a)(1) and § 416.945(a)(1). The ALJ then uses that RFC to determine whether the claimant can perform her past relevant work.   *Id.* at § 404.1545(a)(5) and § 416.945(a)(5).   The determination of RFC is based upon a consideration of all the relevant medical and other evidence in the record.  20 C.F.R. § 404.1545(a)(3) and § 416.945(a)(3).[7]

In making the RFC determination, the ALJ must consider the objective medical evidence in the record, including the medical opinions of treating providers.  A treating provider's opinion merits "controlling weight," under federal regulations and Fourth Circuit authority, if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record."   20 C.F.R.  § 404.1527(c)(2) and § 416.927(c)(2); *see also Mastro v. Apfel*, 270 F.3d 171, 178 (4th Cir. 2001).  Conversely, "if [a] physician's opinion is not supported by clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded significantly less weight." *Craig*, 76 F.3d at 590. However,

> a finding that a treating source medical opinion is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to "controlling weight," not that the opinion should be

---

[7] "Other evidence" includes statements or reports from the claimant, the claimant's treating or nontreating sources, and others about the claimant's medical history, diagnosis, prescribed treatment, daily activities, efforts to work, and any other evidence showing how impairments or symptoms affect the claimant's ability to work.  20 C.F.R. § 404.1529(a) and § 416.929(a).

rejected.

SSR 96-2p, 61 Fed. Reg. 34490, 34491 (July 2, 1996).

Therefore, even if a treating provider's opinion is not entitled to controlling weight, it is "still entitled to deference and must be weighed using all of the factors" provided by the regulations. *Id.* at *5. Those factors are:  (1) the examining relationship, giving more weight to sources who have examined a claimant; (2) the treatment relationship, looking at the length, nature, and extent of the treatment relationship; (3) supportability, based upon the extent of the evidence presented in support of the opinion; (4) consistency with the record; and (5) the specialization of the physician.  20 C.F.R. § 404.1527(c) and § 416.927(c); *accord Johnson v. Barnhart*, 434 F.3d 650, 654 (4th Cir. 2005).

By regulation, the ALJ must explain in his decision the weight assigned to *all* opinions, including treating sources, non-treating sources, state agency consultants, and other non-examining sources.  20 C.F.R. § 404.1527(e)(2)(ii) and § 416.927(e)(2)(ii).  Therefore, when the ALJ's decision is not fully favorable to the claimant, the decision must contain

> specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight.

SSR 96-2p, 61 Fed. Reg. 34490, 34492 (July 2, 1996).  This specificity requirement is necessary because the reviewing court

> face[s] a difficult task in applying the substantial evidence test when the [Commissioner] has not considered all relevant evidence. Unless the [Commissioner] has analyzed all evidence and has sufficiently explained the weight he has given to obviously probative exhibits, to say that his decision is supported by substantial evidence approaches an abdication of the court's "duty to

scrutinize the record as a whole to determine whether the conclusions reached are rational."

*Arnold v. Secretary*, 567 F.2d 258, 259 (4th Cir. 1977) (quoting *Oppenheim v. Finch*, 495 F.2d 396, 397 (4th Cir. 1974)).

In assessing Hall's RFC, the ALJ considered all of the relevant medical and other evidence, and explained the weight he assigned to each medical opinion.  With respect to Dr. Kidd, who the ALJ identified as a "former treating provider" as of the time of decision, the ALJ properly assigned little weight to Dr. Kidd's February 28, 2011 letter indicating that Hall was fit to return to work in her former capacity, noting that Dr. Kidd authored the letter well before the amended onset date and her alleged period of decompensation in October 2011.  R. 30. Similarly, the ALJ assigned little weight to Dr. Kidd's mental RFC assessment of December 5, 2011, which concluded Hall had marked and extreme limitations in some aspects of her mental functioning.  As grounds therefor, the ALJ noted that Dr. Kidd had last treated Hall in January 2011 and that his opinion was inconsistent with the totality of the record following the alleged onset disability date of October 18, 2011, including Hall's regular mental status examinations since that date, her relatively conservative treatment history, her extensive activities of daily living, and her performance of online college coursework.  R. 30.

Hall asks the Court to find that the ALJ failed to rely on "persuasive contrary evidence" in declining to accord Dr. Kidd's assessment controlling weight.  The Court declines the invitation for the following reasons.  First, to the extent that Dr. Kidd was, in fact, a treating physician[8] in December 2011, it is undisputed that he had not treated Hall in the preceding

---

[8] By regulation, a "treating source" includes a physician or psychologist "who provides" or "has provided" someone with medical treatment and evaluation <u>and</u> is one "who has, or has had, an ongoing treatment relationship" with a patient, in which such treatment was of "a frequency consistent with accepted medical practice for the type of treatment and/or evaluation required for the [patient's] medical conditions."  20 C.F.R. § 404.1502.  Such a provider, however, will not

eleven months, including in the critical period following her alleged onset of disability in October 2011.  As noted above, in the months that followed, Hall was seen, not by Dr. Kidd, but rather by a psychiatrist, a neurologist, a physician's assistant, therapists, and nurses, primarily associated with the HNNCSB.

Second, the record resulting from such treatment and therapy revealed that, although Hall suffered from depression and anxiety, she had no neurological medical problems giving rise to seizures, her mental status was intact and mostly stable and/or improving, her insomnia was manageable when Hall took her medication, and her depression responded to medication and therapy.  Although Hall occasionally exhibited constraints upon her mood and affect, they appeared to coincide with serious external stressors in Hall's life or her failure to obtain and take medications, and such constraints responded to treatment.  Indeed, in the most recent examination of Hall (prior to the ALJ hearing), Dr. Mensch reported on May 9, 2013, that Hall's depression appeared to be "in remission" and that Hall was looking for part-time work.  R. 872.

Third, Dr. Kidd's opinion regarding Hall's marked and extreme limitations on mental functioning not only is at odds with the varied and extensive post onset date record, but also contradicts his own February 2011 statement that plaintiff could both return to work and, with appropriate training, undertake new duties.  R. 553.  How Dr. Kidd arrived at these two contradictory assessments, without having treated Hall in the interim, is not explained.  Although he noted, in completing the December 2011 questionnaire, that "episodes of anxiety without apparent precipitating events interfere in functioning and lead to 'escape' behavior, avoidance, and withdrawal" by Hall, R. 694, this statement offers no meaningful analysis for Dr. Kidd's changing views of Hall's abilities, particularly since he first diagnosed her with anxiety disorder

---

be deemed a treating source when the relationship with the source "is not based on [a] . . . medical need for treatment or evaluation, but solely on [a] . . . need to obtain a report in support of [a] claim for disability."  *Id.*

in August 2010.  R. 450-51.  Accordingly, because Dr. Kidd's status as a treating provider was somewhat stale and because his December 2011 opinion is neither well-supported by clinical findings nor consistent with his own analysis and the totality of the evidence of record, the ALJ properly elected not to accord controlling weight to his assessment of the severity of Hall's mental impairments.  *See Mason v. Shalala*, 994 F.2d 1058, 1065 (3rd Cir. 1993)("check-the box assessments without explanatory comments are not entitled to great weight, even when completed by a treating physician").

Therefore, the Court must next consider whether the ALJ correctly decided to assign little weight to Dr. Kidd's December 2011 assessment of Hall's mental capacity.  R. 30.  Hall argues that, in doing so, the ALJ failed to properly evaluate the factors, noted above, governing the assignment of weight to a treating provider's opinion that is not accorded controlling weight.  20 C.F.R. §§ 404.1527(c)(2)-(c)(6), 416.927(c)(2)-(c)(6) (analyzing the treatment relationship, the support provided for the opinion, its consistency with the record, the credentials of the provider, and other appropriate factors).  The Court disagrees.

With respect to the nature, length, extent, and frequency of the treatment relationship, the ALJ correctly determined that, as of December 2011, Dr. Kidd's relationship with Hall (involving five treatment sessions from August 2010 through early January 2011, R. 450-67), had gone stale.  At the time of the ALJ's decision, Dr. Kidd was not privy to the most current information concerning Hall's post-onset condition, her impairments and abilities, and response to the extensive treatment rendered by providers with the HNNCSB from November 2011 through May 2013.  *See* 20 C.F.R. §§ 404.1527(c)(6), 416.927(c)(6) (noting a provider's familiarity with information of record in a case is a factor to be considered when assigning weight to the provider's opinion).

23

Also, for the reasons discussed above, Dr. Kidd's responses to the questionnaire, which consisted primarily of checking boxes, were neither well-supported nor accompanied by a recent examination of Hall following the alleged onset date of disability.

With respect to consistency, although Dr. Kidd's August 2010 diagnosis of an anxiety disorder is generally consistent with the medical record and the findings of other providers, the ALJ properly found Dr. Kidd's assessment of Hall's mental RFC to be inconsistent with the substantial evidence of record.  *Cf. Gross v. Heckler*, 785 F.2d 1163, 1166 (4th Cir. 1986) (because the existence of a psychological disorder is "not necessarily disabling," a claimant must establish a "related functional loss").  In addition to the facts discussed above, Dr. Kidd's assessment of Hall's mental functioning failed account for Hall's completion of 70 credits worth of online college coursework in pursuit a bachelor's degree, as noted by the ALJ.  R. 74-75 (testifying she stayed online with school work "pretty much all day").  In fact, Hall's apparent ability to study, do homework, and participate in online class discussions, is consistent with Dr. Kidd's February 2011 statement that Hall could return to work and take on new duties.  R. 553. On the other hand, Hall's grades (mostly A's, B's, and C's), as well as her activities of daily living reviewed by the ALJ, cast doubt on Dr. Kidd's later assessment that Hall labors under major or serious limitations in maintaining attention and concentration for extended periods, in making simple work-related decisions, in interacting with or working in proximity to others, and responding to changes in a workplace.  R. 692-94.

Instead, in assessing Hall's RFC, the ALJ gave greater weight to the opinions of the consultative examiner, Mr. Koah, and state agency medical and psychological consultants.[9] Although Mr. Koah assessed Hall soon after her hospitalization in October 2011, the ALJ noted

---

[9] The ALJ accorded only moderate weight to the opinions of Hall's pastor, having found that the pastor's characterization of Hall's symptoms were both "extreme" and inconsistent with the observations of others who treated Hall.  R. 31.

that, even at that time, Mr. Koah found Hall was "able to perform serial sevens, her memory was intact for testing, she could perform simple math, and her abstract thinking was fine."  R. 29. The ALJ then accorded "significant weight" to Mr. Koah's assessment that Hall could "perform simple and repetitive tasks and should be able to work without special supervision."  R. 30.  The ALJ also accorded moderate weight to the opinions of state agency psychological consultants, who determined that Hall's limitations were no more than moderate, noting that it was "reasonable to assess moderate limitation in social functioning here," in light of Hall's anxiety diagnosis and the hearing testimony.  R. 31.

Finally, in identifying Dr. Kidd as having a Ph.D., R. 30, it is apparent that the ALJ considered Dr. Kidd's status as a licensed clinical psychologist in assessing his opinion.

Based upon the foregoing analysis, the Court finds that substantial evidence supports the ALJ's decision to discount the weight given to Dr. Kidd's December 2011 opinion.

### B.      The ALJ Properly Assessed Hall's Credibility

Hall next asserts that the ALJ incorrectly found her statements about the intensity, persistence, and limitations resulting from her symptoms not entirely credible by allegedly discounting and measuring Hall's credibility against the ALJ's RFC finding and her conservative treatment history and in contravention of other evidence of record.

To make his credibility determination, the ALJ engaged in the two-step inquiry detailed in 20 C.F.R. § 404.1529 by evaluating:  (1) whether an underlying medically determinable impairment was shown that could reasonably be expected to produce the claimant's symptoms, and (2) if so, the extent to which such symptoms limited the claimant's functioning and ability to work, based upon their intensity, persistence, and limiting effects.  *See Craig*, 76 F.3d at 594-95. The ALJ found that Hall's depression and anxiety could reasonably be expected to cause her

symptoms, but that Hall's "statements concerning the intensity, persistence and limiting effects of these symptoms [were] not entirely credible for the reasons explained in this decision." R. 29.

This Court must give great deference to the ALJ's credibility determinations. The Fourth Circuit has held, "[w]hen factual findings rest upon credibility determinations, they should be accepted by the reviewing court absent 'exceptional circumstances.'" *Edelco, Inc. v. NLRB*, 132 F.3d 1007, 1011 (4th Cir. 1997) (internal citations omitted). Therefore, this Court must accept the ALJ's assessment of plaintiff's credibility unless it is unreasonable, contradicts other factual findings, or is based on an insufficient reason. Id.

Hall first attacks the ALJ's credibility determination by suggesting that the ALJ committed an analytical error of the type identified by the Fourth Circuit in *Mascio v. Colvin*, 780 F.3d 632 (4th Cir. 2015). In *Mascio*, the Fourth Circuit criticized an ALJ's use of "boilerplate language" indicating that a claimant's statements are not credible "to the extent that they are inconsistent with the [RFC]" because such language implied that an ALJ determined a claimant's ability to work first and then used that to assess a claimant's credibility. *Mascio*, 780 F.3d at 639 (noting "this boilerplate 'get things backward' by implying 'that ability to work is determined first and is then used to determine the claimant's credibility'") (citation omitted). Here, however, the ALJ neither used the objectionable boilerplate language nor engaged in the illogical analysis criticized by the Fourth Circuit. R. 29 (noting Hall's symptoms were not "entirely credible for the reasons explained in this decision").

To the contrary, the ALJ carefully and thoroughly considered Hall's symptoms, the medical and other evidence of record, the opinion evidence, Hall's hearing testimony, the testimony of her pastoral counselor, Hall's treatment history and progression, Hall's daily activities, and the history of Hall's use of various medications and the management of them. R.

27-31.  In his review, the ALJ compared the symptoms of record and those testified to by Hall with the other evidence of record and found, among other things, that:  (1) while Hall sometimes presented with mood and affect abnormalities, her mental status and "cognition has generally remained intact;" (2) her most recent progress notes show Hall to have undergone improvement, and presenting with a euthymic mood; (3) her condition had improved, as evidenced by that fact that her depressive disorder had most recently been identified as "in remission;"  (4) on occasion, Hall allowed herself to run out of medications or had not taken them consistently, undermining her claim about the severity of her symptoms[10]; (5) a neurological consultation in April 2012 showed Hall had "intact immediate recall, 4/5 five-minute recall, fluent speech, preserved calculation, concentration, and attention, and [a] normal fund of knowledge;" (6) similar findings were made during the consultative examination; (7) aside from the events of mid-October 2011, Hall's treatment history was "entirely conservative;" and (8) the disabling symptoms Hall identified were belied by her own reported daily activities, including her "academic activities." R. 29-31.

In making his credibility determination, the ALC properly considered the objective medical and other evidence of record, including the pertinent factors specified by regulation, such as Hall's daily activities, the duration and intensity of her symptoms, whether certain factors (such as family issues) caused and/or aggravated her symptoms, her medication and other treatments received, and the actions taken by Hall to deal with her impairments.  *See* 20 C.F.R.

---

[10] The Court rejects Hall's suggestion that her failure to take medication at certain times resulted from financial problems and that the ALJ erred in discounting her testimony without giving this due consideration.  Hall Br. at 11.  Although the record shows Hall infrequently complained she could not afford to get her medications filled, R. 719-21, 832 (requesting help with getting blood pressure medication), it also shows that Hall received assistance from the HNNCSB in obtaining mental health medications when she could not afford to pay for them, and the gaps in taking medications stemmed from Hall's failure to take them or to show up for appointments to get prescriptions refilled.  R. 713-14, 721, 724, 792, 796-97, 802, 827.

§ 404.1529(c).   Contrary to Hall's claim, the ALJ also correctly considered Hall relatively conservative course of treatment as a relevant credibility consideration.  *See, e.g., Nichols v. Colvin*, No. 2:14cv50, 2015 WL 1185894, at \*20 (E.D. Va. March 13, 2015) (Magistrate Judge affirmed by Judge Doumar, finding an ALJ properly referred to a claimant's "conservative treatment history" in discounting claimant's credibility); *Staton v. Colvin*, 2:13cv572, 2015 WL 627876, at \*8 (E.D. Va. Feb. 6, 2015) (Magistrate Judge affirmed by Judge Davis, finding that ALJ properly considered "conservative medication management" in credibility analysis).

For these reasons, the Court finds that ample and substantial evidence supports the ALJ credibility determination in this case.

### C.       The ALJ Properly Framed his Hypothetical to and Considered the Vocational Expert's Testimony in Finding No Disability

With respect to the ALJ's analysis at step five, Hall claims that the ALJ's alleged errors in discounting Dr. Kidd's treating opinion and in finding Hall's statements about the impact of her symptoms less than fully credible, resulted in a faulty and incomplete hypothetical to the VE that failed to fully account for her impairments.   Accordingly, Hall argues that the VE's testimony about jobs that Hall could perform, and the ALJ's resulting finding of no disability, were erroneous.  *See Walker v. Bowen*, 889 F.2d 47, 50 (4th Cir. 1989) (a "relevant and helpful" opinion from a vocational expert "must be based upon a consideration of all other evidence in the record . . . and it must be in response to proper hypothetical questions which fairly set out all of claimant's impairments").

At the hearing, the ALJ posed a hypothetical asking whether jobs existed in the national economy for someone of Hall's age, education, and work experience, who was able to perform medium work activity, limited to simple, repetitive, nonproduction tasks, but without frequent interaction with co-workers or the public.  R. 81.   VE Edwards indicated there were and

identified the jobs noted above.  Counsel for Hall then modified the hypothetical asking whether jobs existed for such a hypothetical person, "who would not be able to complete a normal work day without interruptions from psychologically based symptoms . . . such that [this person] would miss [work] four or more times . . . due to these limitations."  R. 82.  In a second hypothetical, counsel for Hall inquired whether jobs would exist for such a hypothetical person if her impairments required that she have "[z]ero people contact" and "very minimal supervisory" contact in her work.  R. 82-83.  These hypotheticals incorporated Dr. Kidd's mental RFC of December 5, 2011 and, to a lesser extent, Hall's testimony about her impairments.  R. 53, 56, 77, 693.  In response, VE Edwards indicated there were no jobs for such a hypothetical claimant.  R. 82-83.  Having found that substantial evidence supports the ALJ's credibility determination, as well as his treatment of Dr. Kidd's opinion, the Court also concludes that the hypothetical put to the VE was legally sufficient for the same reasons.

A related question, not addressed in the parties' briefs, however, is whether the ALJ adequately explained why he similarly excluded from the hypothetical any express reference to Hall's "moderate difficulties" in maintaining concentration, persistence, or pace that he identified when considering if Hall satisfied a listed impairment at step three.  R. 26; *see Mascio*, 780 F.3d at 638-39 (absent explanation why such a moderate limitation identified at step three fails to "translate into a limitation in [a claimant's] residual functional capacity," a hypothetical to a VE that fails to encompass such a limitation is incomplete and necessitates a remand).  Here, the ALJ addressed this matter before, and without the benefit of the direction provided by *Mascio*.  Nevertheless, the ALJ's reasoning for doing so is apparent in his thorough discussion of and reliance upon the following factors, among others, pertaining to the nature and extent of Hall's impairments and her RFC:  namely, her intact cognition; her generally benign and intact

mental status; her ability to engage in abstract thinking; her goal-directed and logical thought processes; the overall improvement in her mood, affect, and condition from October 2011 to May 2013; the remission of her depressive disorder; the disconnect between Hall's reported symptoms and her decision not to take and maintain her supply of medications on several occasions; examinations showing her memory intact, her ability to perform serial sevens and simple math, and other tasks requiring calculation, concentration, and attention; the absence of any medical, neurological problem; her conservative treatment history; her extensive daily activities, which include cooking, cleaning, occasionally driving, and caring for a child with mental impairments; and her regular use of a computer in undertaking and successfully engaging in a significant body of collegiate coursework.  R. 29-30.

In doing so, the ALJ also differentiated between his identification of limitations in step three and the "more detailed assessment" required to gauge Hall's mental RFC and the "degree of limitation" encompassed within the RFC.  R. 27.  The ALJ's decision, therefore, contains sufficient information addressing why his hypothetical included neither the limitations proposed by Dr. Kidd (and reported by Hall), nor any express reference to the limitation the ALJ identified at step three.  Instead, in recognition of Hall's anxiety and her limitation in social functioning, the ALJ properly incorporated into the hypothetical limits pertaining to interaction with co-workers and the public and limits pertaining to the complexity of the work and tasks to be performed.  The ALJ then went one step farther by incorporating into the hypothetical work activity involving only repetitive and nonproduction tasks.  This adequately accounted for Hall's then existing impairments with respect to concentration, persistence, and pace, based upon all of the evidence of record.  For these reasons, the ALJ committed no error at step five of the analysis.

### D.    *Hall's Post-Hearing Evidence Does Not Require Remand to the ALJ*

Finally, Hall argues that this matter should be remanded to allow the ALJ to consider additional evidence presented to the Appeals Council, that is, Dr. Kidd's supplemental examination of Hall and his October 7, 2013 report.  R. 883-84.  The Appeals Council received the report, but determined that is was not material and provided no basis for overturning the ALJ's decision.  R. 2-4.

To be entitled to a remand based upon new evidence, a claimant "must show that the evidence is new and material and must establish good cause for failing to present the evidence earlier," in addition to showing that such additional evidence relates to the period on or before the ALJ's decision.  *Wilkins v. Sec'y of Dept. of Health & Human Servs.*, 953 F.2d 93, 95-96 (4th Cir. 1991); *see also* 42 U.S.C. § 405(g) (a "court . . . may order additional evidence to be taken before the Commissioner . . . , but only upon a showing" the evidence is new, material, and "good cause" exists for the failure to previously submit such evidence).  Evidence is deemed "new 'if it is not duplicative or cumulative' and is material if there is 'a reasonable possibility that the new evidence would have changed the outcome.'"  *Meyer v. Astrue*, 662 F.3d 700, 705 (4th Cir. 2011) (quoting *Wilkins*, 953 F.2d at 96 n.3).

As discussed above, on September 30, 2013, Dr. Kidd reassessed Hall's functioning in areas he previously found to be deficient, "to determine whether further reduction in function had occurred."  R. 883.  To do this, Dr. Kidd assessed Hall's verbal and nonverbal functioning using several tests, which indicated Hall possessed verbal intellectual functioning and verbal memory in the low average range.  R. 884.  With respect to nonverbal intellectual functioning, Dr. Kidd's testing indicated Hall performed at the age of a seven year old.  Functionally speaking, Dr. Kidd opined that such results indicated that Hall had "difficulty recognizing and

comprehending the meaning of nonverbal social cues" and that, while her verbal skill suggest social effectiveness, Hall's "ability to implement in social settings her verbal understandings is likely to be similar to that" of a child.  R. 884.  Also, Dr. Kidd observed that a mental status examination showed that Hall's memory and ability to concentrate were also impaired.  R. 884.

As it purports to longitudinally assess Hall's nonverbal and verbal functioning, Dr. Kidd's supplemental report arguably relates back to his prior treatment of Hall, which last occurred nine months before the amended onset date and over two and a half years before the ALJ's decision.  His findings, however, are not new and were previously considered by the ALJ. Indeed, when Dr. Kidd previously assessed Hall's mental RFC in December 2011, he noted similar moderate, marked, and extreme limitations in her social interaction, adaptation, and maintenance of concentration and persistence, and up to moderate limitations in her understanding and memory.  R. 691-94.

Nor is the information reported in the supplemental report material.  Having previously considered the results of Dr. Kidd's opinions and properly accorded them little weight, no reason exists to conclude that a one-time, post-decisional examination, containing no new information would have caused the ALJ to decide this matter differently, particularly because the supplemental report is substantially at odds with the opinion and other evidence of record previously reviewed by the Court.  For all these reasons, no remand is required to give further consideration to Dr. Kidd's supplemental report.

## VI.  RECOMMENDATION

For the foregoing reasons, this Court recommends that Plaintiff's Motion for Summary Judgment (ECF No. 16) be DENIED, Defendant's Motion for Summary Judgment (ECF No. 18) be GRANTED, and the decision of the Commissioner be AFFIRMED.

## VII.  **REVIEW PROCEDURE**

By copy of this Report and Recommendation, the parties are notified that pursuant to 28 U.S.C. §  636(b)(1)(c):

1.  Any party may serve upon the other party and file with the Clerk written objections to the foregoing findings and recommendations within fourteen (14) days from the date of mailing of this report to the objecting party, see 28 U.S.C. § 636(b)(1), computed pursuant to Rule 6(a) of the Federal Rules of Civil Procedure, plus three (3) days permitted by Rule 6(d) of said rules.  A party may respond to another party's objection within fourteen (14) days after being served with a copy thereof.

2.  A district judge shall make a *de novo* determination of those portions of this Report or specified findings or recommendations to which objection is made.

The parties are further notified that failure to file timely objections to the findings and recommendations set forth above will result in waiver of right to appeal from a judgment of this court based on such findings and recommendations.  *Thomas v. Arn*, 474 U.S. 140 (1985); *Carr v. Hutto*, 737 F.2d 433 (4th Cir. 1984); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).

_____/s/_____
Robert J. Krask
UNITED STATES MAGISTRATE JUDGE

Norfolk, Virginia
November 20, 2015